Opinion issued on May 16, 2002.











 

 


In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-99-00723-CV

____________


EDUARDO MORENO LAPARADE, Appellant


V.


DR. VICTOR MANUEL RIVERA, Appellee






On Appeal from the 80th District Court

Harris County, Texas

Trial Court Cause No. 96-52942






O P I N I O N


 Plaintiff/appellant, Eduardo Moreno Laparade, appeals from a final judgment,
based on a jury verdict and a partial summary judgment, rendered in favor of
defendant/appellee, Dr. Victor Manuel Rivera. We affirm, in part, and reverse and
remand, in part.

FACTUAL BACKGROUND


 On February 21, 1993, the famous Mexican actor Mario Moreno Reyes,
popularly known as Cantinflas, was admitted to Methodist Hospital in Houston for
cancer treatment. He was discharged from Methodist Hospital on March 27, 1993,
and returned to his home in Mexico, where he died on April 20, 1993. 

 In his will, Cantinflas left his entire estate to his only child, Mario Arturo
Moreno Ivanova. However, Cantinflas's nephew, Eduardo Moreno Laparade,
claimed that Cantinflas had signed an agreement on March 4, 1993, transferring to
him the rights to 39 of Cantinflas's films. In June 1993, Laparade brought a civil suit
in Mexico to enforce the March 4, 1993 assignment. A lawsuit was also initiated in
California over the movie rights, which are valued at over $1.5 million.

 On October 26, 1993, Ivanova filed criminal fraud charges in Mexico against
Laparade. In the criminal complaint, Ivanova alleged that Laparade's claim that
Cantinflas had assigned him the rights to the 39 films was "fallacious" and that the
March 4, 1993 agreement was "fictitious." In support of these allegations, Ivanova
stated in the complaint that (1) the notary in Houston that had notarized both
Laparade's and Cantinflas's signatures on the March 4, 1993 agreement claimed that
she did not witness Cantinflas signing the agreement, and (2) Cantinflas was in a
weakened physical state and not "in full use of his faculties" on March 4, 1993. 

 Laparade was arrested by the Mexican authorities on December 22, 1995. 
Eventually, the charges were dismissed for lack of evidence. However, Laparade was
arrested a second time in June 1996. Laparade was jailed, prosecuted, and convicted;
however, his conviction was ultimately reversed on appeal.

 While in Methodist Hospital in 1993, Cantinflas was treated by appellee, Dr.
Victor Manuel Rivera. Dr. Rivera is a neurologist who first saw Cantinflas following
a stroke in 1987. At Ivanova's request, Dr. Rivera wrote three letters and traveled to
Mexico to give sworn declarations regarding Cantinflas's physical and mental
condition at the time the March 4, 1993 agreement was signed. The information
provided by Dr. Rivera was used to prosecute Laparade in Mexico. 

PROCEDURAL HISTORY


 Laparade sued Ivanova and Dr. Rivera for conspiracy to abuse process,
intentional infliction of emotional distress, and conspiracy to commit intentional
infliction of emotional distress. (1) After Laparade was exonerated of the criminal
charges, he added claims for malicious prosecution and conspiracy to commit
malicious prosecution. 

 On April 21, 1998, the trial court signed an order that stated Ivanova should be
dismissed from the suit based on forum non conveniens. The trial court (1) ordered
Ivanova be dismissed with prejudice, (2) severed Laparade's claims against Ivanova
from the main cause, and (3) placed the severed claims in a separate cause with a new
cause number. In a separate appeal, Laparade challenged the trial court's dismissal
of his claims against Ivanova based on forum non conveniens. This Court dismissed
that appeal for lack of jurisdiction because Laparade failed to timely file his notice
of appeal.

 The trial court granted summary judgment in favor of Dr. Rivera on Laparade's
claims for intentional infliction of emotional distress, conspiracy to intentionally
inflict emotional distress, and conspiracy to commit abuse of process. The remainder
of the case was tried to a jury in January 1999. The only claims submitted to the jury
were Laparade's claims against Dr. Rivera for malicious prosecution and conspiracy
to commit malicious prosecution. The jury returned a verdict in favor of Dr. Rivera
on both claims. As a result, the trial court entered a take-nothing judgment against
Laparade.

 In four points of error, Laparade contends (1) the trial court erred in dismissing
Ivanova from the suit based on forum non conveniens, and the trial court improperly
separated the claims against Ivanova from the claims against Dr. Rivera; (2) the
evidence was factually insufficient to support the jury's verdict; and (3) the trial court
erred in granting partial summary judgment in favor of Dr. Rivera.

DISCUSSION



 Separation of Claims


 In points of error one and two, Laparade challenges the trial court's dismissal
and severance of his claims against Ivanova. Laparade first argues that the claims
were improperly dismissed based on forum non conveniens. As stated above,
Laparade filed a separate appeal challenging the trial court's dismissal of his claims
based on forum non conveniens, which we have dismissed for lack of jurisdiction. 
In this appeal, we cannot consider whether the court properly dismissed Laparade's
claims based on forum non conveniens in a separate, final and appealable order
because that was entered in a severed cause. (2) 

 Laparade also complains that the dismissal of his claims against Ivanova
resulted in an improper separation of claims. Laparade argues that, because most of
his claims were founded on conspiracy, the claims against Ivanova are inseparably
linked to, and intertwined with, the claims against Dr. Rivera. Laparade asserts that
the dismissal of his claims against Ivanova prejudiced him in the presentation of his
case against Dr. Rivera. 

 Dr. Rivera contends that Laparade waived this complaint because he failed to
object to the severance of the claims. To this, Laparade responds that he is not
complaining about the trial court's severance of the claims, rather he is complaining
about the improper separation of his claims against Ivanova from his claims against
Dr. Rivera, which resulted from the erroneous dismissal of Ivanova from the case
based on forum non conveniens. In his brief, Laparade summarizes his complaint as
follows:

 [P]laintiff's complaint is not really with the severance itself; it is with
the trial court's dismissal of Ivanova. Once the claims against Ivanova
were dismissed, it did not matter whether they were severed . . . or were
not severed and remained interlocutory. Either way, the case would
have been tried against Dr. Rivera alone--which is precisely what
plaintiff says prejudiced his case. (3)

 To preserve a complaint for appellate review, the record must show that the
complaint was first presented to the trial court and comports with the complaint made
on appeal. See Tex. R. App. P. 33.1(a)(1). Preservation allows the trial court to
correct error and prevents a party from surprising an opponent by raising complaints
for the first time on appeal. See Pirtle v. Gregory, 629 S.W.2d 919, 920 (Tex. 1982);
Lewis v. Tex. Employers Ins. Ass'n, 242 S.W.2d 599, 600 (Tex. 1952). Here, the
record reveals that Laparade did not contest in the trial court Ivanova's dismissal on
the ground that he now asserts on appeal, i.e., that the dismissal amounted to an
improper separation of claims. The claims against Ivanova were dismissed and
severed in April 1998. However, Laparade did not complain about the "improper
separation" until after the claims against Dr. Rivera were tried, judgment was entered,
and this appeal was taken. The trial court was never presented with an opportunity
to correct any error that may have been made. 

 We hold that points of error one and two are not properly preserved for our
review. See Tex. R. App. P. 33.1(a)(1). Accordingly, these issues are overruled.


 Sufficiency of Evidence


 Laparade's third point of error challenges the factual sufficiency of the
evidence to support the jury's findings on Laparade's claims for malicious
prosecution and conspiracy to commit malicious prosecution. 


 Standard of Review 


 When a party attacks the factual sufficiency of an adverse finding on an issue
on which it has the burden of proof, it must demonstrate on appeal that the adverse
finding is against the great weight and preponderance of the evidence. Dow Chem.
v. Francis, 46 S.W.3d 237, 242 (Tex. 2001). We must consider and weigh all of the
evidence, and can set aside a verdict only if the evidence is so weak, or if the finding
is so against the great weight and preponderance of the evidence, that it is clearly
wrong and unjust. See Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986). 
If we find the evidence to be factually sufficient, we are not required to detail all the
evidence supporting the finding; if we find the evidence to be factually insufficient,
we must detail all the evidence relevant to the issue and clearly state why the jury's
finding is so against the great weight and preponderance of the evidence that it is
manifestly unjust. Ellis County State Bank v. Keever, 888 S.W.2d 790, 794 (Tex.
1994).

 When undertaking a factual sufficiency review, we may not merely substitute
our opinion for that of the trier of fact and determine that we would reach a different
conclusion. Merckling v. Curtis, 911 S.W.2d 759, 763 (Tex. App.--Houston [1st
Dist.] 1995, writ denied). The jury is the sole judge of the credibility of the witnesses
and the weight to be given their testimony. Miller v. Kendall, 804 S.W.2d 933, 939
(Tex. App.--Houston [1st Dist.] 1990, no writ). We may not pass upon the
witnesses' credibility or substitute our judgment for that of the jury, even if the
evidence would clearly support a different result. Pool, 715 S.W.2d at 634. 


 Malicious Prosecution 


 With regard to the malicious prosecution, the jury was asked whether Ivanova
or Dr. Rivera maliciously prosecuted Laparade. The jury responded "no" for both.
On appeal, Laparade contends that the overwhelming weight of the evidence
established that Dr. Rivera maliciously prosecuted Laparade. 

 The jury was instructed that malicious prosecution "occurs when one person
initiates or procures, with malice, and without probable cause at the time the
prosecution is commenced, the prosecution of an innocent person." The jury was
further instructed that malice "means ill will, bad or evil motive, or such gross
indifference to the rights of others as to amount to a willful or wanton act."

 It is undisputed that the Mexican authorities who prosecuted Laparade relied
on the letters and declarations provided by Dr. Rivera regarding Cantinflas's medical
condition. Laparade contends that the evidence presented at trial showed that Dr.
Rivera's letters and declarations were misleading, contained false statements, and
were contradicted by Cantinflas's medical records. He argues that such evidence
established that Dr. Rivera acted with malice as defined in the jury charge.

 Laparade cites to the following evidence in support of his position that the
evidence established that Dr. Rivera acted with malice:


 Dr. Rivera's letter of August 13, 1993, stated that on March 1,
1993, Cantinflas was operated on while under general anesthesia;
however, the medical records indicate that local anesthesia was
used.

 The August 13 letter also stated that Cantinflas received
chemotherapy on March 1, 2, and 3, 1993, but the medical records
indicate that the Cantinflas did not have chemotherapy on March
1.


 


 The criminal complaint filed by Ivanova on October 26, 1993,
incorporated much of the language of Dr. Rivera's August 13
letter.

 In his December 7, 1993 letter, Dr. Rivera stated that his August
13 letter "described [Cantinflas's] clinical situation according to
the medical file . . . " and simply present[s] the data as described
in the medical file by the various treating physicians." However,
the medical records contradict Dr. Rivera's testimony in some
respects and Dr. Rivera later admitted that the information he
provided was from his own memory, not the medical records.

 In Dr. Rivera's January 15, 1995 declaration given in Mexico, he
again stated that Cantinflas was placed "under general anesthesia"
when he had a surgical procedure on March 1, 1993, and had
received chemotherapy on March 1.

 During the January 15 declaration, when Dr. Rivera was asked
"whether on March 4, 1993, [Cantinflas] could speak any words
and whether he could move by himself and whether his hands had
sufficient strength to hold a pen, Dr. Rivera responded that
Cantinflas "was not able to express himself adequately, his speech
being practically unintelligible and, due to his sedation and
debility, he does not judge that he was capable of writing or
signing any document . . . ."

 In the January 15 declaration, Dr. Rivera also stated that from
March 1 through 4, 1993, Cantinflas "was kept practically
asleep." 

 In another declaration given on September 1, 1995, River stated:
"All of these medications mentioned . . . had the collateral effect
in the case of [Cantinflas], of producing a state of sedation and
extreme debility . . . ."

 In the September 1 declaration, Dr. Rivera also stated that "[o]n
March 4, 1993, Cantinflas was not lucid at any time . . . ." and
"[Cantinflas's] mental and physical condition required assistance
for every type of function, such as feeding himself, moving in
bed, personal hygiene and physiological functions such as:
defecation and bladder function through a permanent insert."


 


 Cantinflas's medical records indicate that his doctors were
discussing with him the option of leaving the hospital and
checking into a hotel for the remainder of his chemotherapy,
indicating that the doctors felt that he was competent to
participate in the decision whether he should leave the hospital. 

 The nurses' notes from March 4, 1993 found in Cantinflas's
medical records indicate that Cantinflas was "awake, alert,
oriented to name, place, time and purpose" and "follows simple
commands, speech clear and swallows without difficulty." The
records from March 4 also indicate that he was expressing a
preference for certain medications.

 It is undisputed that on March 4, 1993--the same day that
Cantinflas allegedly signed the agreement transferring his film
rights to Laparade--he signed a contract with Columbia Pictures.

 The medical records indicate that on March 5, 1993, Cantinflas
was able to shower.

 The nurses' notes from March 7, 1993 state that Cantinflas was
able to feed himself, get up and sit in a chair, and went to the
bathroom on his own.

 Dr. Rivera's declarations did not present any of the "positive"
information contained in Cantinflas's medical records.

 In a letter written by Dr. Rivera on August 5, 1996, he discussed
"Significant Medical Antecedents" to Cantinflas's condition. 
Specifically, regarding the stroke Cantinflas had in 1987, he
stated that by "September 1987 significant changes has [sic]
appeared in his personality affecting his mood and attitude" and
that he "behav[ed] very inappropriately and abstractedly."
However, a history and physical of Cantinflas from June 1987 
states that he was "absolutely normal as far as mental status." 

 The August 5 letter states that in 1989 "[Cantinflas's] operational
judgment was affected and all of this was due to his organic
cerebral lesions" although he "continued being functional within
certain circumstances."

 The August 5 letter indicates that Cantinflas's problems worsened
in 1991.

 A letter written by Dr. Rivera in 1991 states that Cantinflas is "of
sound mind and perfectly competent . . . ."

 The August 5 letter also discusses Cantinflas's neurological
condition while he was in Methodist Hospital, and, more
specifically, focuses on Cantinflas's condition from March 2
through 6, 1993. In this regard, Dr. Rivera wrote: "Patient is
senile, with periods of dementia due to cerebral embolisms,
antecedent subdural cerebral hematoma, loss of cortical volume
(atrophy) due to age . . . all of which is documented and precedes
his entry into the hospital . . . ."




 The medical records show that when Cantinflas was admitted to
Methodist Hospital, Dr. Rivera wrote that Cantinflas had made a
"total neurological recovery" from his stroke.

 The August 5 letter states: "All of the preceding was documented
through the clinical records and files and represents not only my
neurological opinion but also that of the consultants and
personnel of the Methodist Hospital who attended [Cantinflas]
and who made notes in his record."


 Laparade argues that the evidence showed that Dr. Rivera acted with malice in
providing the letters and declarations to the Mexican authorities because, as stated in
the jury instructions, he acted with "such gross indifference to the rights of others as
to amount to a willful or wanton act." In particular, Laparade contends that Dr.
Rivera acted with "gross indifference" because Dr. Rivera (1) made statements in the
letters and declarations without determining if they comported with the medical
records, (2) misrepresented that his statements were based on the medical records
when they were not, and (3) omitted information included in the medical records that
indicated that Cantinflas was not as physically and mentally impaired as Dr. Rivera
portrayed him to be.

 However, as stated above, in conducting a factual sufficiency review, we must
weigh and consider all of the evidence. At trial, Dr. Rivera offered testimony that
explained the reason for the discrepancies between the information that he provided
to the Mexican authorities in his letters and declarations and Cantinflas's medical
records. 

 Dr. Rivera testified that the opinions he provided to the Mexican authorities
were not based on medical notes but on his

 knowledge of [Cantinflas] for many years taking care of him and being
so close to him. I'm using my experience as a neurologist, as an expert
in cerebral vascular disease and dementia. . . . And these opinions are
based on my entire knowledge of the particular case and particular man. 

 According to Dr. Rivera, Cantinflas suffered from a form of dementia that
fluctuated daily. At trial, other witnesses, including Laparade's medical expert,
agreed that Dr. Rivera, as Cantinflas's treating physician, was in the best position to
give opinions about Cantinflas's mental condition. 

 Dr. Rivera also explained that, due to a concern for Cantinflas's privacy,
sensitive information relating to Cantinflas's deteriorating mental condition was not
written in the medical records. Because Cantinflas was admitted to Methodist
Hospital for cancer treatment, Dr. Rivera testified it was not relevant to detail
Cantinflas's mental condition in the medical records. Dr. Rivera also explained that
the notation he made when Cantinflas was admitted to Methodist that Cantinflas had
made a "total neurological recovery" referred to Cantinflas's physical condition, not
his mental status. When asked by Laparade's counsel whether it was not reckless to
provide the information to the Mexican authorities based on memory, Dr. Rivera
responded that he thought that the authorities only wanted a "general picture of the
situation during those days." Dr. Rivera also stated that, while he had access to his
own office notes, he did not have complete access to Cantinflas's medical records at
the time he wrote the letters regarding Cantinflas's condition.

 It was the jury's province, not ours, to judge the credibility of the evidence and
resolve conflicts or inconsistencies. Trans Am. Holding Co. v. Market-Antiques &
Home Furnishings, Inc. 39 S.W.3d 640, 648 (Tex. App.--Houston [1st Dist.] 2000,
pet. denied); see also Murphy v. Tex. Farmers Ins. Co., 982 S.W.2d 79, 85 (Tex.
App.--Houston [1st Dist.] 1998) aff'd, 996 S.W.2d 873 (Tex. 1999). We conclude
that there was sufficient evidence to support the jury's finding that Dr. Rivera did not
act with malice. Viewing the record as we must, we hold that the jury's verdict
regarding Laparade's malicious prosecution claim was not against the great weight
and preponderance of the evidence. 

 3. Conspiracy to Commit Malicious Prosecution

 Laparade also contends that the jury's finding with regard to conspiracy to
commit malicious prosecution was against the great weight and preponderance of the
evidence. With regard to Laparade's conspiracy claim, the jury was asked: "Was
Victor Manuel Rivera a part of a conspiracy with Mario Arturo Moreno Ivanova to
maliciously prosecute Eduardo Laparade?" The jury responded "no."

 On this issue, the jury was instructed:

 To be part of a conspiracy, Victor Manuel Rivera and Mario Arturo
Moreno Ivanova must have had knowledge of, and intended a common
objective or course of action that resulted in damages to Eduardo
Moreno Laparade. One or more persons involved in the conspiracy
must have performed some act or acts to further the conspiracy.

 The evidence showed that in 1993 Ivanova asked Dr. Rivera to provide his
opinion regarding Cantinflas's condition. Dr. Rivera testified that he had given
testimony and provided letters for many other patients regarding their condition. Dr.
Rivera stated he first learned of a dispute regarding the March 4, 1993 agreement
between Ivanova and Laparade in August 1993. At his deposition, Ivanova testified
that he requested Dr. Rivera to provide his opinion regarding Cantinflas's condition
to be used in Laparade's criminal prosecution. However, at trial Ivanova did not
recall telling Dr. Rivera how the information would be used. Dr. Rivera testified that,
although he knew his testimony had been requested in connection with litigation
between Ivanova and Laparade, he was unaware that it was for a criminal
prosecution. He stated that he was confused by the Mexican legal system. 

 Dr. Rivera acknowledged that he spoke to the assistant attorney general in
Mexico. Laparade's counsel pointed out that this should have made Dr. Rivera aware
that he was providing information for Laparade's criminal prosecution. However, Dr.
Rivera stated that he only spoke to the assistant attorney general with regard to the
last declaration that he provided. 

 The evidence showed calls were made between Ivanova's and Dr. Rivera's
telephone numbers over the years. Ivanova testified that probably 25 to 35 percent
of the calls pertained to the suit. He explained that most of the calls were regarding
his son who suffered from a heart condition or a soccer team of which both he and Dr.
Rivera were fans. 

 Laparade claims that the statements provided by Dr. Rivera are themselves
evidence of a conspiracy because they distort what is stated in the medical records. 
However, as discussed above, Dr. Rivera provided an explanation for the
discrepancies between the medical records and the information provided to the
Mexican authorities. It was the jury's prerogative to believe Dr. Rivera's explanation.

 The evidence also showed that Ivanova paid Dr. Rivera's travel expenses to
Mexico to provide the declarations. However, this alone would not show a
conspiracy. If Dr. Rivera had been providing testimony in the civil dispute between
Ivanova and Laparade, it would have been appropriate for Ivanova to pay his
expenses. Ivanova also paid for Dr. Rivera's attorney's fees to defend against
Laparade's suit. Ivanova testified that he paid the attorney's fees because he felt bad
that Dr. Rivera had been brought into the dispute.

 Viewing the evidence as we must, we conclude that the evidence was factually
sufficient for the jury to find Dr. Rivera did not conspire with Ivanova to maliciously
prosecute Laparade.

 We overrule point of error three.


 Summary Judgment


 In point of error four, Laparade challenges the partial summary judgment
granted in favor of Rivera on his claims for conspiracy to commit abuse of process, 
intentional infliction of emotional distress, and conspiracy to intentionally inflict
emotional distress. Rivera filed both a traditional and a "no evidence" motion for
summary judgment.

 1. Standard of Review 

 The granting of traditional motion for summary judgment brought pursuant to
Texas Rule of Civil Procedure 166a(c) is proper only when the movant establishes
that there is no genuine issue of material fact and that the movant is entitled to
judgment as a matter of law. Tex. R. Civ. P. 166a(c); Randall's Food Mkts., Inc. v.
Johnson, 891 S.W.2d 640, 644 (Tex. 1995). A defendant who conclusively negates
at least one of the essential elements of a cause of action is entitled to summary
judgment on that cause of action. Id. 

 Once the movant has established a right to a summary judgment, the burden
shifts to the non-movant. Marchal v. Webb, 859 S.W.2d 408, 412 (Tex.
App.--Houston [1st Dist.] 1993, writ denied). The non-movant must respond to the
motion for summary judgment and present to the trial court any issues that would
preclude summary judgment. City of Houston v. Clear Creek Basin Auth., 589
S.W.2d 671, 678 (Tex. 1979); Marchal, 859 S.W.2d at 412. In reviewing a summary
judgment, we must indulge every reasonable inference in favor of the non-movant
and resolve any doubts in his favor. Johnson, 891 S.W.2d at 644; Lawson v. B Four
Corp., 888 S.W.2d 31, 33 (Tex. App.--Houston [1st Dist] 1994, writ denied). We
will take all evidence favorable to the non-movant as true. Id.

 In a no-evidence summary judgment, the movant must specifically state the
elements as to which there is no evidence. Tex. R. Civ. P. 166a(i). The burden then
shifts to the non-movant to produce evidence that raises a fact issue on the challenged
elements. Id. When reviewing the grant of a no-evidence summary judgment, we
assume all evidence favorable to the non-movant is true and indulge every reasonable
inference and resolve all doubts in favor of the non-movant. Flameout Design &
Fabrication, Inc. v. Pennzoil Caspian Corp., 994 S.W.2d 830, 834 (Tex.
App.--Houston [1st Dist.] 1999, no pet.) (involving rule 166a(i) motion). A
no-evidence summary judgment is improperly granted if the non-movant brings forth
more than a scintilla of evidence to raise a genuine issue of material fact. Tex. R.
Civ. P. 166a(i).

 On appeal, in cases in which the burden has shifted to the non-movant to raise
a fact issue, we cannot consider any ground for reversal that was not expressly
presented to the trial court by written motion, answer, or other response to the motion
for summary judgment. Clear Creek Basin Auth., 589 S.W.2d at 677; Hussong v.
Schwan's Sales Enter., Inc., 896 S.W.2d 320, 323 (Tex. App.--Houston [1st Dist.]
1995, no writ). When a trial court does not state the basis for its decision in its
summary judgment order, as in this case, we must uphold the order if any of the
theories advanced in the motion are meritorious. Rogers v. Ricane Enters., Inc., 772
S.W.2d 76, 79 (Tex. 1989).

 2. Conspiracy to Commit Abuse of Process 

 a. No Abuse of Process

 In his second amended motion for summary judgment, Dr. Rivera contends that
he was entitled to summary judgment because he did not commit abuse of process as
a matter of law. In doing so, Dr. Rivera relies on the proposition that conspiracy is
a derivative claim, which cannot exist without an underlying tort. See Tilton v.
Marshall, 925 S.W.2d 672, 681 (Tex. 1996). 

 On appeal, Laparade correctly responds that, to succeed on his conspiracy to
commit abuse of process claim, it was not necessary for him to show that Dr. Rivera
committed abuse of process because he can prevail by showing that either Dr. Rivera
or Ivanova committed abuse of process. In other words, once a civil conspiracy is
found, each co-conspirator is responsible for the action of any of the co-conspirators
which is in furtherance of the unlawful combination. Akin v. Dahl, 661 S.W.2d 917,
921 (Tex. 1983). Each element of the cause of action of defamation is imputed to
each co-conspirator. See id. The concept of civil conspiracy is used, then, to extend
liability in tort beyond the active wrongdoer to those who have merely planned,
assisted, or encouraged his acts. Carroll v. Timmers Chevrolet, Inc., 592 S.W.2d 922,
925-26 (Tex. 1979). A finding of civil conspiracy imposes joint and several liability
on all co-conspirators for any actual damages resulting from the acts in furtherance
of the conspiracy. Hart v. Moore, 952 S.W.2d 90, 98 (Tex. App.--Amarillo 1997,
writ denied). 

 In this case, Laparade alleged that both Dr. Rivera and Ivanova committed
abuse of process. (4) Thus, even assuming that Dr. Rivera showed as a matter of law
that he did not commit abuse of process, this alone would not be sufficient to support
summary judgment in his favor for conspiracy to commit abuse of process. Rather,
it would be necessary for Rivera to show that neither he nor Ivanova committed abuse
of process as a matter of law; this, Rivera failed to do. (5) 

 b. No Evidence of Meeting of the Minds

 The elements of civil conspiracy are (1) two or more persons; (2) an object to
be accomplished; (3) a meeting of minds on the object or course of action; (4) one or
more unlawful, overt acts; and (5) damages as a proximate result. Operation
Rescue-Nat'l v. Planned Parenthood of Houston and Southeast Tex., Inc., 975 S.W.2d
546, 553 (Tex. 1998). The meeting of the minds requirement requires knowledge of
the course of action and specific intent. See Triplex Communications, Inc. v. Riley,
900 S.W.2d 716, 719 (Tex. 1995). To show specific intent, the plaintiff must show
that the parties were aware of the harm or wrongdoing at the inception of the
combination or agreement. Id. 

 In his second amended motion for summary judgment, the only element that
Rivera attacks is the meeting of the minds requirement. Rivera argues that Laparade
presented no evidence as to this element. Specifically, Dr. Rivera contends that there
is no evidence that Rivera had a specific intent to abuse the legal process and harm
Laparade. 

 In support of his opposition to Dr. Rivera's amended motion for summary
judgment, (6) Laparade offered Dr. Rivera's answers to interrogatories. Dr. Rivera's
answer to interrogatory number 8 reads as follows:

 INTERROGATORY NO. 8:

 Please identify any and all communications between you and
Mario Arturo Moreno relating to or concerning any facts involved in
this lawsuit, and for each such communication state the following: date,
method of communication, substance of the communication and place
where the communication took place.


 ANSWER:


 August 12 or 13, 1993 - Telephone call from Mexico concerning Mario
Moreno Reyes' medical records, along with a general discussion of the
litigation and the need for a letter describing Mario Moreno Reyes'
condition during his treatment in Houston.


 October 1993 - Conversation in person with Mario Arturo Moreno
Ivanova regarding copies of the medical records for certification at
Mexican Consulate.


 December 7, 1993 - Telephone call from Mexico concerning a follow-up
letter describing Mario Moreno Reyes' medical condition.


 January 1995 - Telephone call from Mexico requesting that I travel to
Mexico City and give testimony regarding Mario Moreno Reyes'
medical condition.


 September 1995 - Telephone call from Mexico requesting that I travel
to Mexico City and give testimony regarding Mario Moreno Reyes'
medical condition.


 November - December 1996 - Telephone call from Mexico requesting
that I travel to Mexico City and give testimony regarding Mario Moreno
Reyes' medical condition.


 Laparade also offered Ivanova's deposition testimony. Ivanova testified that
Dr. Rivera knew that the letters and testimony he provided would be used to
prosecute Laparade. 

 Laparade also offered the deposition testimony of Melvy Reyna, the notary
who had notarized the March 4, 1993 agreement transferring Cantinflas's movie
rights to Laparade. Reyna worked for the doctor who shared an office suite with Dr.
Rivera. Reyna provided letters and live testimony to the Mexican authorities stating
that she had notarized the document without actually witnessing Cantinflas signing
the agreement and that Laparade had brought the agreement to her with Cantinflas's
signature already on it. Reyna testified that Dr. Rivera wrote the first letter she
provided to the Mexican authorities and that she then signed it. She also testified that
Dr. Rivera helped persuade her to travel to Mexico to testify.

 In support of his opposition to Dr. Rivera's motion for summary judgment,
Laparade also offered Dr. Rivera's letters and testimony provided to the Mexican
authorities along with Cantinflas's medical records. Laparade points out that
inconsistencies exist between Dr. Rivera's letters and declarations and Cantinflas's
medical records. Laparade contends that the "evolution of Rivera's letters and
declarations" about Cantinflas's medical and mental condition also evidences a
"meeting of the minds" between Dr. Rivera and Ivanova. Laparade contends that
with each letter and declaration, Dr. Rivera made Cantinflas's condition sound more
grave. In his opposition to the motion for summary judgment, Laparade stated: "It
can be reasonably inferred that the statements made by Defendant Rivera regarding
[Cantinflas's] alleged medical and mental condition, which with time wandered
further (sic) from the truth, were the result of Ivanova's initial unsuccessful efforts
to prosecute Mr. Laparade in an attempt to coerce Mr. Laparade to relinquish his
rights under the [March 4,1993] Agreement . . . ."

 Indulging all reasonable inferences in favor of Laparade as we must, we hold
that the summary judgment evidence offered by Laparade constituted more than a
scintilla of evidence to raise a genuine issue of material fact as to the existence of a
meeting of the minds between Dr. Rivera and Ivanova. Summary judgment should
not have been granted on Laparade's claim for conspiracy to commit abuse of
process.

 3. Intentional Infliction of Emotional Distress

 Laparade contends that the trial court erred in granting summary judgment on
his intentional infliction of emotional distress claim. The elements of intentional
infliction of emotional distress are (1) a defendant acted intentionally or recklessly;
(2) the conduct was extreme and outrageous; (3) the conduct caused the plaintiff
emotional distress; and (4) the resulting emotional distress was severe. Twyman v.
Twyman, 855 S.W.2d 619, 621 (Tex. 1993).

 In his amended and second amended motions for summary judgment, Dr.
Rivera asserted that Laparade could not show that the conduct at issue was "extreme
and outrageous." He also asserted that Laparade could produce no evidence to
support the other three elements necessary to prove intentional infliction of emotional
distress. 

 In his response to Dr. Rivera's amended motion for summary judgment,
Laparade stated that Dr. Rivera's "no-evidence" ground was misplaced because he
did not assert a direct cause of action against Dr. Rivera for intentional infliction of
emotional distress. However, Laparade's second amended petition--the live pleading
at the time the amended and second amended motions for summary judgment were
filed--clearly states a direct cause of action against Dr. Rivera for intentional
infliction of emotional distress. Laparade offered no other response to this ground
for summary judgment and offered no evidence on the three elements.

 On appeal, Laparade contends that Dr. Rivera's motion is fatally defective
because it states in conclusory fashion that there is no evidence on the other three
elements without specifically identifying them. 

 A no-evidence motion for summary judgment "must state the elements as to
which there is no evidence." See Tex. R. Civ. P. 166a(i). The comments to rule
166a(i), which are "intended to inform the construction and application of the rule,"
state: "The motion must be specific in challenging the evidentiary support for an
element of a claim or defense; paragraph (i) does not authorize conclusory motions
or general no-evidence challenges to an opponent's case." See Tex. R. Civ. P. 166a(i)
cmt. If a no-evidence motion for summary judgment is not specific in challenging a
particular element or is conclusory, the motion is legally insufficient as a matter of
law and may be challenged for the first time on appeal. See McConnell v. Southside
Ind. Sch. Dist., 858 S.W.2d 337, 342 (Tex. 1993).

 We do not agree that Dr. Rivera's no-evidence ground was conclusory or failed
to properly identify the challenged elements. In his motion, Dr. Rivera identified the
four elements of intentional infliction of emotional distress, discussed the element of
"extreme and outrageous" conduct in detail, and then challenged the absence of any
evidence on the remaining three elements. This was sufficient to satisfy the
requirements of rule 166a(i). The burden then shifted to Laparade to respond with 
evidence that raises a genuine issue of material fact on the challenged elements. Tex.
R. Civ. P. 166a(i); Flameout Design & Fabrication, Inc., 994 S.W.2d at 834. 
Laparade failed to respond with evidence relating to the three challenged elements.

 We hold that the trial court properly granted summary judgment on Laparade's
intentional infliction of emotional distress claim. 

 4. Conspiracy to Commit Intentional Infliction of Emotional Distress

 In Dr. Rivera's amended and second amended motions for summary judgment,
he asserted that the information he provided to the Mexican authorities was protected
by absolute privilege because it was made in the context of a judicial proceeding. 
The basis for Dr. Rivera's motion on Laparade's conspiracy to commit intentional
infliction of emotional distress claim was stated as follows:

 To be actionable, a conspiracy must consist of wrongs that would have
been actionable against the conspirators individually. . . . If any act by
one person cannot give rise to a cause of action, then the same act
cannot give rise to a cause of action if done pursuant to an agreement
between several persons. . . . Since Dr. Rivera cannot be liable for
intentional infliction of emotional distress because of the absolute
privilege, it follows that he cannot be liable for conspiracy to
intentionally inflict emotional distress. . . . 

 

 However, a review of Laparade's live pleading shows that the basis for this
cause of action is not limited to the letters and testimony Dr. Rivera provided to the
Mexican authorities. Laparade also relies on other factual allegations. Specifically,
Laparade alleges that Dr. Rivera assisted Ivanova in convincing Melvy Reyna, the
notary who notarized the March 4, 1993 agreement, to provide false testimony to the
Mexican authorities. In addition, Laparade alleges that Dr. Rivera assisted Ivanova
in publishing defamatory statements about Laparade in the Mexican press. Dr. Rivera
failed to address these allegations in his motion for summary judgment. Because Dr.
Rivera's motion did not address all of factual allegations forming the basis of
Laparade's claim for conspiracy to intentionally inflict emotional distress, it was not
proper for the trial court to grant summary judgment on this claim. See McConnell,
858 S.W.2d at 341; Chessher v. Southwestern Bell Tel. Co., 658 S.W.2d 563, 564
(Tex. 1983); Smith v. Atlantic Richfield Co., 927 S.W.2d 85, 88 (Tex. App.--Houston
[1st Dist.] 1996, writ denied). We sustain Laparade's point of error four with regard
to Laparade's claims for conspiracy to abuse process and conspiracy to intentionally
inflict emotional distress; we overrule point of error four with regard to Laparade's
claim for intentional infliction of emotional distress.

 CONCLUSION


 The evidence was factually sufficient to support the jury's factual findings on
Laparade's malicious prosecution and conspiracy to commit malicious prosecution
claims, and the trial court properly granted summary judgment on Laparade's
intentional infliction of emotional distress claim. However, we reverse the trial
court's take-nothing judgement to the extent it is based on Laparade's claims for
conspiracy to commit abuse of process and conspiracy to intentionally inflict
emotional distress, and remand that portion to the trial court for further proceedings
consistent with this opinion. Accordingly, the judgment of the trial court is affirmed,
in part, and reversed and remanded, in part.

 
 



 Margaret Garner Mirabal

 Justice 

 

Panel consists of Justices Mirabal, Nuchia, and Price. (7)


Do not publish. Tex. R. App. P. 47.












 
1. We note that at one point, Laparade also sued Dr. Rivera for conspiracy to
commit defamation; however, that cause of action was apparently abandoned.
2. Because Laparade filed a joint brief in this appeal and in the appeal of the trial
court's dismissal of Ivanova, it is difficult to discern whether Laparade
intended this complaint to relate to this appeal or the companion appeal.
3. Although Laparade characterizes this complaint as one attacking the improper
"separation" of his claims, it appears from reading the above statement that it
is actually an alternative method of attacking the court's dismissal based on
forum non conveniens. As we have stated, we cannot decide in this appeal
whether Ivanova was properly dismissed based on that doctrine.
4. The elements of abuse of process are (1) the defendant made an illegal,
improper, or perverted use of the process, a use neither warranted nor
authorized by the process, (2) the defendant had an ulterior motive or purpose
in exercising such illegal, perverted, or improper use of the process, and (3)
plaintiff was damaged as a result of the illegal act. Graham v. Mary Kay Inc.,
25 S.W.3d 749, 756 (Tex. App.--Houston [14th Dist.] 2000, pet. denied); 
Rose v. First Am. Title Ins. Co., 907 S.W.2d 639, 643 (Tex. App.--Corpus
Christi 1995, no writ). The critical aspect of this tort is the improper use of the
process after it has been issued. Graham, 25 S.W.3d at 756; Bossin v. Towber,
894 S.W.2d 25, 33 (Tex. App.--Houston [14th Dist.] 1994, writ denied). 
When the process is used for the purpose for which it was intended, even
though accompanied by an ulterior motive, no abuse of process occurs.
Graham, 25 S.W.3d at 756; Baubles & Beads v. Louis Vuitton, S.A., 766
S.W.2d 377, 378 (Tex. App.--Texarkana 1989, no writ). 
5. We are not finding that Dr. Rivera would not be entitled to summary judgment
if he showed that he and Ivanova did not commit abuse of process, only that
he failed to so allege in his motion for summary judgment.
6. Although Laparade filed an opposition to Rivera's amended motion for
summary judgment, he did not file a response to Rivera's second amended
motion for summary judgment; however, Rivera's grounds for summary
judgment on this point are unchanged from those he asserted in his amended
motion for summary judgment. Thus, we assume that the trial court relied on
Laparade's opposition to Rivera's amended motion for summary judgment.
7. The Honorable Frank C. Price, former Justice, Court of Appeals, First District
of Texas at Houston, participating by assignment.